UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ADAM KANUSZEWSKI, et al.,

       Plaintiff,

v.

MICHIGAN DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
et al.

       Defendant.

_____/

Case No. 18-cv-10472

Honorable Thomas L. Ludington
Magistrate Judge Patricia T. Morris

## <u>ORDER GRANTING MOTIONS TO DISMISS AND DISMISSING COMPLAINT WITH PREJUDICE</u>

On February 8, 2018, Plaintiffs Adam and Ashley Kanuszewski, Shannon Laporte, and Lynette Wiegand filed a complaint pursuant to 42 U.S.C. § 1983 as parent-guardians and next friend to their minor children (collectively, "Plaintiffs"). ECF No. 1. They allege that the State of Michigan operates an unconstitutional Newborn Screening Program which involves sampling, testing, and storing infant blood without parental consent. The complaint names Defendants Michigan Department of Health and Human Services (MDHHS) and its director Nick Lyon, MDHHS Bureau of Laboratories director Dr. Sandip Shah, state epidemiologist and Michigan BioTrust manager Dr. Sarah Lyon-Callo, MDHHS Newborn Screening managers Harry Hawkins[1] and Mary Kleyn, Michigan Neonatal Biobank (the "Biobank") (also known as the Michigan Neonatal Biorepository) and its director Dr. Antonio Yancey. The named individuals are sued in their official and individual capacities. Plaintiffs filed an amended complaint (which they titled as a "corrected complaint)) to address a deficiency in the original complaint (no summons requested), which was stricken. ECF No. 3. Defendants filed motions to dismiss. ECF

---

[1] Mr. Hawkins has since passed away.

Nos. 15, 21. In response, Plaintiffs filed a second amended complaint (which they titled "first amended" complaint and will hereinafter be referred to as the "amended complaint") as of right, and the motions to dismiss were terminated as moot. *See* ECF Nos. 26. Defendants then filed motions to dismiss the amended complaint pursuant to Federal Rule of Civil procedure 12(b)(1) and 12(b)(6) which are now before the Court. ECF No. 32, 33, 34.

## I.

When addressing a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court is to accept all of Plaintiffs' factual allegations as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). Accordingly, the relevant facts are derived from Plaintiffs' complaint.

Since the 1960's, the State of Michigan has operated a newborn screening program, whereby medical professionals take blood samples (dried blood spots, or "DBS cards") from newborn babies to test for various diseases. Am. Compl. ¶ 1, ECF No. 26. The DBS cards are ultimately transferred to the Michigan Neonatal Biobank and stored indefinitely for testing and further research. *Id.* ¶ 10-11, 33. The parents of the infant children in this case did not consent to the blood test or to the State taking custody of the blood samples. *Id.* ¶ 3-4. MCL 333.5431(1) directs health care professionals to administer the blood test. Violating the statute is a misdemeanor. MCL 333.5431(5). The statute exempts the blood sampling and testing from informed consent requirements. MCL 333.5431(2).

Plaintiffs were never extended the option to opt-out of the blood test. *Id.* ¶ 45. Plaintiffs "might have been" presented with an option to opt out of donating the blood to research. *Id.* ¶ 46. In addition to the blood samples, healthcare professionals also submitted identifying information of the infants. *Id.* ¶ 50. MDHHS's public documentation promises confidentiality and promises to resist demands for information that could identify the infant. *Id.* ¶ 66. Despite these promises,

"Blood samples on several occasions were provided pursuant to state court orders . . . and being sold to third party businesses and researchers." *Id.* ¶ 70. Michigan Neonatal Biobank "actively sells punches of various sizes to universities and businesses at different rates." *Id.* ¶ 80. "Since the blood spots contain deeply private medical and genetic information . . . the Parents are concerned and fear about the misuse of that information and fear the possibility of discrimination against their Infants and perhaps even relatives through the use of such blood samples and research activity thereon." *Id.* ¶ 78. "That [f]ear is well-founded and actual as the sharing of blood spots containing deeply private medical and genetic information has recently resulted in the arrest of an alleged killer but has already resulted in the wrongful arrest of persons who were not guilty of any crime." *Id.* ¶ 79.

## II.

The amended complaint alleges that Defendants violated Plaintiffs' fourteenth amendment liberty interest in refusing unwanted medical procedures by conducting the blood test without parental consent (count I) or by improper/incomplete/false consent (count II). *Id.* ¶¶ 84-90, 91-101. The amended complaint also alleges that Defendants violated Plaintiffs' fourth amendment rights to be free from unreasonable searches and seizures where the initial extraction and seizure for testing was conducted without parental consent (count III), and then indefinite storage was also conducted without parental consent (count IV and V).

Defendants filed three separate motions to dismiss. ECF Nos. 32, 33, 34. The State Defendants (MDHHS, Mary Klen, Sarah Lyon-Callo, Nick Lyons, and Sandeep Shah) argue that Plaintiffs lack standing to assert fourteenth amendment claims because children possess no absolute right to have their parents or guardians make medical decisions on their behalf. State Def. Mot. at 11, ECF No. 32. The State Defendants also argue that neither the parents nor their

children have standing to assert fourth amendment claims because any injury they allegedly have suffered as a result of the storage of the blood samples is speculative inasmuch as they only assert an "unsubstantiated, vague 'concern[] and fear' about *the potential* for misuse of their children's stored DBS and 'fear [of] *the possibility* of discrimination against their infants *and perhaps even relatives*.'" *Id.* at 13 (quoting Am. Compl. ¶ 78) (emphasis in original). They also argue that the blood test was not a search and, if it was, it was a reasonable one. *Id.* at 32-34. For largely the same reasons, the State Defendants contend Plaintiffs have failed to state a claim for violations of the fourth and fourteenth amendments. The State Defendants also argue that the eleventh amendment bars all claims against MDHHS and all claims against the individual Defendants other than the claims for prospective injunctive relief. *Id.* at 14. Finally, they argue that the claims for money damages against Defendants in their individual capacity are barred by qualified immunity because Defendants have not violated any clearly established rights. *Id.* at 28-29.

Defendants Michigan Neonatal Biobank and its director Antonio Yancy (in his official capacity) filed their own motion to dismiss, which largely echoes the State Defendants' motion. ECF No. 33. Dr. Yancy filed his own motion to dismiss in his individual capacity, arguing that Plaintiffs have not sufficiently alleged his personal involvement in any constitutional violations. ECF No 34. Because the grounds for dismissal provided in the State Defendants' motion are equally applicable to the remaining Defendants, the latter two motions will not be addressed directly.

## III.

A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009).  In considering a Rule 12(b)(6) motion, the Court is directed to construe the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678-79 (quotations and citation omitted).

## IV.

### A.

The newborn screening program does not violate Plaintiffs' substantive due process rights under the fourteenth amendment. Throughout their briefing, the parties refer to three constitutionally protected liberty interests under the fourteenth amendment that might be implicated in this case, often interchangeably. The liberty interests are not interchangeable, however, and it is important to distinguish between the three. First, the parties refer to the right of a child to have its parent make medical decisions on its behalf. Second, the parties refer to the right of a competent person to refuse unwanted medical procedures. Third, the parties refer to a parent's right to make decisions concerning the care, custody, and control of their children.

There does not appear to be any legal authority supporting the notion that children have a constitutionally protected liberty interest in their parent or guardian making medical decisions on their behalf. The case law cited by the parties certainly does not support this notion. Conceptually, this "right" may seem related to the other two. However, when conducting an analysis under the substantive due process clause, it is important to use the precise language describing the constitutionally protected liberty interests that have been recognized by the Supreme Court.

As Plaintiffs emphasize, the Supreme Court has recognized that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990). It is self-evident, however, that an infant is not a *competent* person and cannot therefore make decisions concerning medical treatment. Thus, *Cruzan* is inapplicable to this case.

The Supreme Court has also recognized "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). It is equally true that "a state is not without constitutional control over parental discretion in dealing with children *when their physical or mental health is jeopardized*." *Parham v. J.R.,* 442 U.S. 584, 603 (1979) (holding that, notwithstanding a parent's desire to have their child committed for mental health treatment, the child is entitled to an evaluation by a neutral fact finder with final decision making authority regarding whether the child ought to be committed). Indeed, Supreme Court precedent recognizes "two competing values of equal worth: the right of parents to parent and the right of children to safety." *Spiering v. Heineman*, 448 F. Supp. 2d 1129, 1140 (D. Neb. 2006).

Supreme Court precedent, however, has not delineated the parameters of a "parent's right to parent" in a way that can be neatly applied to new sets of facts. See *Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003) (noting the Court's lack of clear guidance on limits of substantive due process parental rights doctrine). Therefore, this Court must look to the well-reasoned opinions of court's adjudicating comparable sets of facts. *Spiering*, in particular, is instructive. In *Spiering*, the court determined that Nebraska's program of mandatory blood testing of infants for metabolic diseases did not violate the parent's fundamental right to make decisions concerning the care, custody, and control of their children. *Spiering v. Heineman*, 448 F. Supp. 2d 1129, 1139 (D. Neb. 2006). Despite recognizing the status of the right as "fundamental," the Court applied rational basis review to the program, noting that "[l]ower courts have often assumed that various reasonable restrictions on such rights would be permissible, and that such restrictions need not be judged under the strict security test." *Id.* (quoting Eugene Volokh, *Parent–Child Speech and Child Custody Speech Restrictions,* 81 N.Y.U. L.Rev. 631, 675 (2006) (internal quotations omitted)).

Applying rational basis review, the court noted that the program promoted the legitimate government interest of safeguarding the health of children via early diagnosis of diseases. *Id.* The court further noted that the testing was rationally related to that objective, given the nationally recognized evidence of the necessity of early screening for these diseases. *Id.* Similarly here, it cannot be reasonably disputed (nor is it) that the State of Michigan has a legitimate interest in early detection of diseases in infants and that the blood testing is connected to that objective. Given the State's interest in safeguarding infant health, and the minimally invasive nature of the procedure (a heel stick drawing 5-6 drops of blood), the blood test does not violate the parents' right to make decisions concerning the care, custody, and control of their children.

Case law addressing compulsory vaccinations also help support the analysis. In *Jacobson*, the Supreme Court found that compulsory vaccination laws with only medical exemptions do not violate any federal constitutional right. *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). More recently in *Nikolao*, a mother challenged a Michigan program mandating vaccinations for school age children as violative of the first amendment free exercise and establishment clauses. *Nikolao v. Lyon*, 875 F.3d 310 (6th Cir. 2017), *cert. denied,* 138 S. Ct. 1999 (2018). Specifically, she challenged the program's requirement that, in order to obtain a religious waiver of the vaccination requirement, a parent must speak with a health worker about the risks of not receiving vaccines. *Id.* In finding that the requirement did not violate the first amendment's establishment clause, the court noted the importance of the programs' goal, namely to promote the health and safety of school age children. *Id.* at 319.

Although the holding involved a first amendment challenge, not a fourteenth amendment challenge (as is the case here), *Nikolao* nevertheless provided a guiding principle, namely that the states' interest in promoting the health and safety of young children can, at times, override individual constitutional rights. *see also Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (noting that the family is not beyond regulation in the public interest and that "neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's wellbeing, the state as parens patriae may restrict the parent's control in many [] ways . . . . Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds").

Plaintiffs take issue with Defendants' reliance on the compulsory vaccination cases. Plaintiffs appear to concede that the police power may, at times, override individual liberty

interests when the police power is used to promote the *public health and safety* and to prevent a person from *harming others*. Resp. at 28. Whereas vaccination requirements are intended to benefit the public by promoting herd immunity, Plaintiffs argue that the blood tests at issue in this case only benefit the individual because "[n]one of the maladies, disorders, or diseases sought to be detected [by NSP blood tests] are contagious or can spread by communitive human contact." *Id.* Where only the wellbeing of an individual is at stake, Plaintiffs contend that the individual's right to refuse unwanted medical treatment (as recognized by *Cruzan*) takes precedence.

Plaintiffs' argument is not persuasive. Indeed, public benefit and herd immunity is one of the main goals of compulsory vaccination requirements. *See Nikolao*, 875 F.3d at 318 (discussing the benefit of herd immunity and the critical mass of the vaccinated population necessary to achieve herd immunity). However, it is equally clear that vaccinations benefit the individual, by immunizing him/her from the disease in question. In fact, the benefit to the individual is more direct than the benefit the public receives via herd immunity. Similarly here, the blood tests benefit the infant by facilitating early detection and treatment. Furthermore, Plaintiffs' reliance on *Cruzan* for the proposition that the individual's right to refuse unwanted medical treatment takes precedence over the state's interest in promoting the public health and safety is misplaced. As explained above, *Cruzan* spoke of the right of *competent* individuals to refuse unwanted medical treatment, and infants are not competent individuals capable of expressing a desire to refuse medical treatment. The only right potentially implicated here is the right of parents to make decisions concerning their children.

Notably, none of the authority provided by Plaintiffs in their response brief supports the proposition that the right of a parent to make decisions concerning the care, custody, and control

of their children includes the right to refuse potentially life-saving testing or treatment on the infant's behalf. Plaintiffs' brief largely consists of quotations from cases supporting broad principles of constitutional law, such as the fact that "minors, as well as adults are protected by the constitution, and possess constitutional rights," and that a minor child is not "the mere creature of the State." Resp. at 23-24, ECF No. 45. These broad statements of law are undoubtedly true and not subject to any debate. However, this does not help resolve the present inquiry, namely whether the facts as pled in this case demonstrate action by the State that violates Plaintiffs' substantive due process rights.

Plaintiffs provide one case, *Dubbs*, which they contend is "the closest and nearly on-point analogous case applying these principles . . ." *Id.* at 25. In *Dubbs*, the plaintiffs pled fourth and fourteenth amendment claims challenging a school's practice of requiring blood tests and physical examinations without parental consent. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003). The district court dismissed all of the claims either pursuant to Federal Rule of Civil Procedure 12(b)(6), or at summary judgment pursuant to Federal Rule of Civil Procedure 56. The 10th Circuit reversed. *Id.*

Notably, however, the 10th Circuit did not express an opinion as to whether the parents' substantive due process rights were violated by the school program. Rather, the 10th Circuit took issue with the district court's reasoning inasmuch as it misapprehended the legal standard by failing to recognize that the parents' had a substantive due process right to control the upbringing (including the medical care) of their children. *Id.* at 1203. The court described this right as one which is deeply rooted in the nation's history and tradition and which falls within the sphere of protected liberty. *Id.* The district court erred in limiting its analysis to the "shocks the conscience" standard applicable to tortious conduct challenged under the fourteenth amendment.

In other words, the district court failed to recognize *the existence* of the parents' fundamental right. The 10th Circuit reversed and remanded on this basis. *Id.* The 10th Circuit did not, however, opine as to whether that right was violated or what standard of scrutiny applied. *Id.* Thus, the *Dubbs* decision does not support Plaintiffs' contention that the blood testing in this case violated their substantive due process rights.

The lack of authority supporting Plaintiffs' position is particularly notable given the holding in *Spiering*, as discussed above, in which the court found no violation of a parent's substantive due process rights under substantially similar facts. *Spiering*, 448 F. Supp. 2d at 1140. Furthermore, the holding of *Spiering* is consistent with the principles derived from the compulsory vaccination cases discussed above. For the foregoing reasons, Plaintiffs have not stated a claim based on the assertion that the blood testing violated the parents' substantive due process rights under the fourteenth amendment to make decisions concerning the care, custody, and control of their children.

**B.**

Nor have the parents stated a claim that the retention and use of their children's blood samples violated their substantive due process rights under the fourteenth amendment. Throughout the complaint, the alleged unconstitutional action is frequently described as a continuous course of conduct: "a piercing device breaching the outside of the skin of the Infants to extract five or six blood drops and seize those blood spots for medical testing and use by the government." *See*, e.g. Am. Compl. ¶ 87. Construing the amended complaint as alleging that the retention and use of the blood samples constituted an independent violation of their substantive due process rights (i.e. one not predicated on a finding that the blood test was itself unconstitutional), the amended complaint still fails to state a claim for such a violation. First, it is

far from clear that the parents' constitutionally protected liberty interest in the care, custody, and control of their children is in anyway impinged by the government retaining and using the blood samples for research and/or commercial purposes as alleged in the amended complaint. Indeed, the authority provided in Plaintiffs' response is devoted almost exclusively to addressing the propriety of the blood test itself. Although Plaintiffs allege that the retention and use of the blood is generally wrongful and inappropriate, Plaintiffs devote minimal effort toward explaining or supporting the notion that the retention and use violates their substantive due process rights.

To the extent the amended complaint may be read to allege some vague privacy interest that is implicated by the retention and use of the blood, that theory is certainly not developed in the complaint or briefed in Plaintiffs' response. The Court should not and will not develop that claim on Plaintiffs' behalf. Such a theory is unlikely to be viable in any event, considering the statute that authorizes the State program in question expressly provides that any use of the blood samples must be "in a manner that preserves the confidentiality of the test subjects." MCL 333.5431(7)(b). Plaintiffs have not alleged that their blood samples have been used so as to compromise their confidentiality, despite their allegations concerning the use of blood samples belonging to third parties (see Am. Compl. ¶ 70).

Secondly, Plaintiffs have not pled facts demonstrating that their blood samples were used contrary to their express wishes. The amended complaint contains a number of allegations as to the State's practice concerning the use of blood samples generally, or in specific instances involving third parties, for commercial research and other purposes. *See, e.g.*, Am. Compl. ¶ 10, 12, 33, 70, 79, 80. The amended complaint cannot, however, be reasonably read to contend that Plaintiffs' specific blood samples are being used in a manner that is contrary to the parents' express wishes. In fact, the allegations in the amended complaint cut the opposite way.

Paragraph 46 acknowledges that the parents "might have been presented with a card giving the Parents an option of whether they want their Infants' *already* illegally seized and tested blood to be donated to medical research." *Id.* ¶ 46 (emphasis in original).

Defendants attached a copy of this consent form to their motion to dismiss, as well as documents which purport to be forms filled out by the parents in this case. ECF Nos. 33-11, 11-12. Plaintiffs take issue with these exhibits for a number of reasons. Plaintiffs argue, without explanation, that these exhibits are improperly attached to a motion to dismiss.[2] Resp. at 4. Plaintiffs also note that the infants' names are redacted, that there only appear to be forms for 7 of the 9 children, and that two of the forms contain flat denials of consent. However, Defendants need not establish that Plaintiffs consented to their blood samples being used for research. At a minimum, these exhibits, in conjunction with Plaintiffs' own allegations and exhibits[3], establish that Plaintiffs were provided consent forms allowing them to opt into or opt out of their infant's blood sample being used for research. The allegations in the complaint provide no reason to believe that Defendants used Plaintiffs' blood samples in a way that was contrary to what the parents expressed on the consent forms.

Plaintiffs also allege that they were insufficiently informed about what they were consenting to: "if they did sign such a document they had insufficient understanding of matters

[2] A court generally cannot look beyond the face of the Plaintiff's complaint when adjudicating a motion to dismiss for failure to state a claim unless the court converts the motion into a motion for summary judgment after proper notice is given to the parties. However, a district court can consider exhibits attached to Defendants' motion to dismiss without converting the motion into one for summary judgment where two conditions are met: 1) the documents are referred to in the complaint, and 2) are central to the claims contained therein. *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). Both of these conditions are met here. Plaintiffs clearly refer to these documents in paragraph ¶ 46, and they are central to the question of whether Defendants used the blood samples in a fashion that was contrary to the express wishes of the Plaintiffs.

[3] Plaintiffs' amended complaint contains an exhibit J, which is also referred to in the complaint at paragraph 66. The exhibit is a pamphlet explaining the Newborn Screening program, which states in relevant part: "you can say 'yes' or 'no' to blood spot research. You will be asked to check a box and sign a form found in your baby's newborn screening card. If you say 'yes,' all blood spots taken for newborn screening may be used, except for the blood spot saved for your own use if needed. If you say 'no,' blood spots will be stored but not used for research. You must contact MDHHS if you do not want blood spots stored for any reason after newborn screening."

they asked/forced to sign and thus were not given proper informed consent." *Id.* ¶ 48. [4] This paragraph implies that the consent form was deficient, but does not explain why. Nor is it apparent how this alleged deficiency renders the subsequent use of the blood samples constitutionally suspect.

In summary, Plaintiffs have made no effort to explain how the retention and use of the blood samples constitutes an independent violation (i.e. one not predicated on a finding that the blood test was itself unconstitutional) of the parents' substantive due process rights to parent their children. Furthermore, it is not reasonably in dispute that the parents were presented with an option to opt out of having their child's blood used for research, and there is no reason to believe that the parents' instructions were not respected. For the foregoing reasons, Plaintiffs have failed to state a claim for a violation of their substantive due process rights based on the retention and use of the blood samples.

## C.

Plaintiffs have also failed to state a claim that the blood testing violated their fourth amendment right to be free from unreasonable search and seizure. An initial question is whether the blood test constituted a search under the fourth amendment. The fourth amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." The fourth amendment is implicated when the government's challenged conduct invades an individual's legitimate expectation of privacy in the area searched or the item seized. *Rawlings v. Kentucky*, 448 U.S. 98, 106, (1980). "The [Fourth] Amendment does not protect the merely subjective expectations of privacy, but only those

---

[4] Considering that the words "asked" and "forced" are hardly synonymous, the Court does not read this paragraph to allege that the parents were compelled to sign the consent forms, and will assume that the word "forced" was added in error. To the extent Plaintiffs wish to stand by the allegation that they were compelled to sign a consent form against their will, Plaintiffs are free to seek leave to amend and clarify this allegation.

expectation[s] that society is prepared to recognize as reasonable." *Oliver v. U.S.*, 466 U.S. 170, 177 (1984).

Defendants cite to *Attson* to support the proposition that a blood test for strictly medical purposes is not a search under the fourth amendment. Mot. at 33 (citing *United States v. Attson*, 900 F.2d 1427, 1433 (9th Cir. 1990)). In *Attson*, the Defendant appealed the denial of his motion to suppress evidence derived from a blood-alcohol analysis conducted by a government-employed attending physician. *Id.* The 9th Circuit held that the blood-alcohol analysis was not a search under the fourth amendment where it was conducted solely for medical purposes and not with the intent to assist the government to perform any investigatory or administrative function. *Id.*

Plaintiffs rely on *Dubbs* for the proposition that the blood test in this case constituted a search. Resp. at 30-31.[5] In *Dubbs*, the 10th Circuit held that medical evaluations of school children by nurses without parental consent constituted searches under the fourth amendment. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1205 (10th Cir. 2003). The court rejected the notion that "non-criminal" and "non-investigatory" searches fell outside the scope of fourth amendment protections. *Id.* The court noted that fourth amendment protections extend to administrative searches as well. *Id.* (citing *Attson*, 900 F.2d at 1433). The court distinguished *Attson*, in which

---

[5] Plaintiffs rely on *Birchfield* and *Mcneely* for the proposition that "It is explicit from binding Supreme Court precedence [*sic*]—a nonconsensual search and seizure of blood requires a warrant and failure to obtain the same is a Fourth Amendment violation." Resp. at 39, ECF No. 45. Neither case supports such a contention. *Birchfield* held that the fourth amendment does not permit warrantless blood tests incident to arrest for drunk driving. *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2184 (2016). Here, no search incident to arrest is at issue. *Mcneely* held that the natural dissipation of alcohol from the bloodstream does not create a per se exigency justifying the warrantless taking of a blood sample in drunk driving cases. *Missouri v. McNeely*, 569 U.S. 141, 145 (2013). Here, there is no allegation that Plaintiffs' blood samples were used for any law enforcement purpose. It is one thing to contend that an individual has a privacy interest in his/her blood even if the blood is not being used for the purposes of criminal prosecution of that individual. It is quite another thing to contend that the case law prohibiting warrantless blood draws for law enforcement purposes creates a per se rule against warrantless blood draws in all situations.

"the medical procedure was consensual; the real issue was the legality of providing the results to police." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1205 (10th Cir. 2003).

The court found that the search in question was analogous to Supreme Court and appellate precedent recognizing a reasonable expectation of privacy when bodily integrity is at issue. *Id.* at 1207 (citing *Schmerber v. State of California,* 384 U.S. 757, 767–68 (1966) ("compelled" blood test an intrusion constituting search); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602 (1989) (breathalyzer exam for chemical analysis constitutes search); *Board of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie, County v. Earls,* 536 U.S. 822 (2002) (urine test search triggering Fourth Amendment inquiry under special needs balancing test); *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 656–58, (1995) (same); *see Yin v. State of California,* 95 F.3d 864, 874 (9th Cir.1996), *cert. denied,* 519 U.S. 1114, 117 S.Ct. 955, 136 L.Ed.2d 842 (1997) (O'Scannlain, J., concurring) ("certain aspects of the routine physical examination at issue here would implicate the requisite 'concerns about bodily integrity,' " and thus trigger protection under the Fourth Amendment); *Earls,* 122 S.Ct. at 2564 (finding school policy of urine testing a "governmental search" but "reasonable").

The parties do not identify any 6th Circuit authority directly on point. In *Hearring*, the 6th Circuit found that the holding of *Dubbs* was "not so clearly foreshadowed by applicable direct authority as to leave no doubt that a nurses' medical examination of a student was subject to fourth amendment requirements." *Hearring v. Sliwowski*, 712 F.3d 275 (6th Cir. 2013) (internal quotation marks omitted). Accordingly, the 6th Circuit held that the nurse was entitled to qualified immunity. The 6th Circuit did not opine, however, as to whether the medical examination constituted a fourth amendment search. Rather, the 6th Circuit's holding was limited: if such a medical examination did constitute a fourth amendment search, that fact was

not clearly established in law for the purposes of qualified immunity. Nevertheless, it is clear enough from the line of cases cited in *Dubbs* (set forth above) that the conduct at issue here, a government mandated blood test that involves a non-consensual invasion of bodily integrity, constitutes a search even if the information derived from that search is not used for law enforcement purposes.

Determining that the blood test constitutes a fourth amendment search does not end the inquiry, however. It must be determined whether the search was a reasonable one. Reasonableness is the "touchstone" of the Fourth Amendment. *Katz v. United States,* 389 U.S. 347, 360 (1967). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Illinois v. Rodriguez,* 497 U.S. 177 (1990). Warrantless searches conducted without consent are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well defined exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 443–44 (1971). One such exception, known as the "special needs doctrine," may apply "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 843 (2002). In special needs cases, courts are tasked with balancing the nature of the intrusion on the individual's privacy against the promotion of legitimate government interests. *Id.* at 829.

In *Dubbs*,[6] the court surveyed instances in which the Supreme Court has recognized an exception for "special needs," including: "a principal's search of a student's purse for drugs in school; a public employer's search of an employee's desk; a probation officer's warrantless search of a probationer's home; a Federal Railroad Administration regulation requiring employees to submit to blood and urine tests after major train accidents; drug testing of United

---

[6] *See supra* section IV. A. for an introduction to the *Dubbs* case.

States Customs Service employees applying for positions involving drug interdiction; schools' random drug testing of athletes; and drug testing of public school students participating in extracurricular activities. *Dubbs*, 336 F.3d at 1213, n. 10. (collecting cases). Despite the lack of clear guidance from the Supreme Court regarding when and under what circumstances the special needs doctrine applies, the *Dubbs* court observed that the cases seem to share at least three features: "(1) an exercise of governmental authority distinct from that of mere law enforcement—such as the authority as employer, the *in loco parentis* authority of school officials, or the post-incarceration authority of probation officers; (2) lack of individualized suspicion of wrongdoing, and concomitant lack of individualized stigma based on such suspicion; and (3) an interest in preventing future harm, generally involving the health or safety of the person being searched or of other persons directly touched by that person's conduct, rather than of deterrence or punishment for past wrongdoing." *Dubbs*, 336 F.3d 1194 at 1213–14 (10th Cir. 2003).

Here, the state-mandated blood screening meets all three criteria. The exercise of governmental authority is entirely distinct from law enforcement. The mandatory blood screening applies to all infants, and involves no individualized considerations of wrongdoing. The Newborn Screening Program is also designed to protect the health and safety of the infants by facilitating early diagnosis, treatment, and prevention.

Notwithstanding its observation that these three criteria were met, the *Dubbs* court nevertheless concluded that the special needs doctrine did not apply to the facts of that case. Notably, the regulations at issue in *Dubbs* expressly required the defendants to "obtain advance parent or guardian authorization for all health and developmental procedures administered through the program," which they did not do. *Id.* (quoting 45 C.F.R. § 1304.20(e)(2)). The

*Dubbs* court noted that the regulations did not require the defendants to obtain a physical examination within 90 days of enrollment, as was their contention, but only required them to "make a determination as to whether the enrolled children have an ongoing source of continuous, accessible health care, and whether they are up-to-date on a schedule of appropriate preventative and primary health care." *Id.* (quoting 45 C.F.R. § 1304.20(a)(1)(i), (ii)) (internal quotation marks omitted). Thus, the defendants in *Dubbs* not only exceeded the requirements of the regulations, but also violated the regulations' express requirement to obtain parental consent. Accordingly, the *Dubbs* court found that the physical examinations in question were not justified by the "special needs" of the head start program, given that those physical examinations were not even authorized under the program's regulations. Here, by contrast, there is no allegation that Defendants have acted contrary to MCL 333.5431, which mandates the blood tests in question and exempts them from informed consent requirements.

Furthermore, the nature of the intrusion on Plaintiffs' privacy is minimal when compared to the state's interest in protecting infant health. The intrusion involves a prick of the infants' heel after birth to withdraw 5 or 6 drops of blood, which enables the medical professionals to screen for a variety of diseases, facilitating early detection, treatment, and prevention. This search is a far cry from the invasive physical examination at issue in *Dubbs*, which is apparent from even a cursory reading of the court's description of that search. *See Dubbs*, 336 F.3d at 1200. Other than the fact that the search at issue in *Dubbs* also involved a blood test, there is very little in common between the conduct at issue in this case and the conduct at issue in *Dubbs*. Moreover, the court in *Dubbs* devoted little attention to the blood test, other than noting that "[b]lood samples were taken by the finger stick (or 'hematocrit') method, which can be frightening to small children." *Id.* It is apparent that the *Dubbs* court was focused on the

intrusiveness of the physical examination. Furthermore, the court noted that the physical examinations were neither required by the regulations nor did the examinations further the regulation's goal of ensuring that the student's had access to healthcare. *Id.* at 1215. Here, by contrast, the blood testing is required by statute, and it cannot reasonably be disputed that the blood testing effectively tests for infant diseases.

Applying the special needs doctrine in this case is consistent with Supreme Court precedent. The Supreme Court has applied the special needs doctrine to uphold searches that were as invasive (or more so) than the search in question here, in furtherance of similar public policy goals. *See, e.g., Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 666 (1989) (permitting drug testing by Customs Service because of critical safety concerns and because results were not made available to law enforcement); *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. at 657–58 (1995) (upholding uniform policy of suspicionless searches of student athletes); *Earls,* 122 S.Ct. at 2564 (holding that special needs "inhere in the public school context" thereby permitting drug testing of participants in extracurricular activities); *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 620 (holding that compulsory blood and urine testing program was justified by "The ... interest in regulating the conduct of railroad employees to ensure safety) (1989). Because the intrusiveness of the blood testing in this case was minimal compared to the state's interest in protecting the health and safety of newborns, the search is reasonable. Accordingly, Plaintiffs have failed to state a claim that the blood testing violated their fourth amendment rights.

### D.

Plaintiffs have also failed to state a claim that the retention and use of the blood samples violates the fourth amendment rights of the parents or their children. As discussed above at

section IV. B., Plaintiffs have not alleged that their blood samples were used contrary to their authorization. Plaintiffs also allege no misuse of their specific blood samples. They aver that "blood samples on several occasions were provided pursuant to state court orders . . . and being sold to third party businesses and researchers . . . As such, [Defendants] do not resist any such demands for information, including those from courts and law enforcement." Am. Compl. ¶¶ 70–71. These allegations, however, are insufficient to support article III standing, which requires Plaintiffs to demonstrate that *they* (and not some third party) suffered an injury in fact. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

Based on the alleged misuse of blood samples of other individuals who are not parties to this case, Plaintiffs "are concerned and fear about the misuse of [their private medical and genetic information] and fear the possibility of discrimination against their Infants and perhaps even relatives through the use of such blood samples and research activity thereon." Am. Compl. ¶. Plaintiffs further allege that their fear is "well-founded and actual as the sharing of blood spots containing deeply private medical information has recently resulted in the arrest of an alleged killer but has already resulted in the wrongful arrest of persons who were not guilty of any crime." *Id.* Am. Compl. ¶ 79. It is entirely unclear what Plaintiffs are referring to when they discuss their fear of the "possibility of discrimination," or how that fear is connected to the alleged misuse of blood samples. In a roundabout way, Plaintiffs appear to be trying to establish that law enforcement use of blood samples in other cases poses a realistic threat that the government will use Plaintiffs genetic information to take some action against them. But this contention is entirely hypothetical. It is clear that the "possibility of discrimination" is an insufficient injury to support article III standing. *See See Lujan v. Defs. of Wildlife*, 504 U.S. at 560 (noting that injury in fact must be "actual or imminent, not conjectural or hypothetical")

(internal quotation marks omitted). For the foregoing reasons, Plaintiffs have failed to state a claim that the retention and use of their blood samples violates their fourth amendment rights.

## V.

Accordingly, it is **ORDERED** that the motions to dismiss, ECF Nos. 32, 33, 34, are **GRANTED**.

It is further **ORDERED** that the amended complaint, ECF No. 26, is **DISMISSED** with prejudice.

s/Thomas L. Ludington<br>
THOMAS L. LUDINGTON<br>
United States District Judge

Dated: August 8, 2018

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 8, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager

---